# SUPREME COURT OF THE STATE OF NEW YORK
## *Appellate Division, Fourth Judicial Department*

**1023**

**KA 12-01870**

PRESENT: SMITH, J.P., PERADOTTO, VALENTINO, WHALEN, AND DEJOSEPH, JJ.

---

THE PEOPLE OF THE STATE OF NEW YORK, RESPONDENT,

V                                                    OPINION AND ORDER

ROBERT M. KNAPP, DEFENDANT-APPELLANT.
(APPEAL NO. 1.)

---

CHARLES MARANGOLA, MORAVIA, FOR DEFENDANT-APPELLANT.

JON E. BUDELMANN, DISTRICT ATTORNEY, AUBURN (CHRISTOPHER T. VALDINA OF COUNSEL), FOR RESPONDENT.

-----------------------------------------------------------------------------------------------------------

Appeal from a judgment of the Cayuga County Court (Mark H. Fandrich, A.J.), rendered September 25, 2012. The judgment convicted defendant, upon a jury verdict, of rape in the first degree, criminal sexual act in the first degree (four counts), aggravated sexual abuse in the third degree, sexual abuse in the first degree (three counts) and endangering the welfare of a child.

It is hereby ORDERED that the judgment so appealed from is unanimously reversed on the law, that part of the omnibus motion seeking to suppress defendant's statements is granted, counts 1, 2, 3, 12, 13, 14 and 17 of the indictment are dismissed, and a new trial is granted on counts 4, 5 and 18 of the indictment.

Opinion by PERADOTTO, J.: In appeal No. 1, defendant appeals from a judgment convicting him upon a jury verdict of, inter alia, rape in the first degree (Penal Law § 130.35 [3]) and, in appeal No. 2, he appeals from a judgment convicting him upon a jury verdict of endangering the welfare of a child (§ 260.10 [1]). Defendant contends in both appeals that County Court erred in refusing to suppress his confession on two grounds, i.e., that he did not knowingly, voluntarily, and intelligently waive his *Miranda* rights because he lacked the capacity to do so, and because his intellectual limitations, combined with coercive police tactics, rendered his statements involuntary. We agree.

I

In the fall of 2008, defendant, an "intellectually handicapped" man with an IQ of 68, moved into a trailer owned by his childhood friend and occupied by the friend and her two children. According to the friend, during the two years in which he lived there, defendant "seemed like part of the family" and was "really close" with the

children.  On October 26, 2010, however, the friend (hereafter, mother) walked into defendant's portion of the trailer and found her three-year-old daughter standing with her pants down a few feet away from defendant.  Defendant was sitting on his bed in his boxer shorts with a sheet or blanket partially covering his lap.  The mother asked the child why her pants were down, and she replied that defendant had touched her "tu-tu," the child's term for her vagina.  The mother called 911.

The police responded to the trailer and, after speaking with the mother and the child, located the defendant on a farm where he apparently worked "doing hay."  Defendant agreed to accompany the police to the station, stopping first at the trailer, where defendant consented to a search of his living quarters.  At the station, a detective read defendant the *Miranda* warnings, and he waived his rights and agreed to speak to the police.  Defendant initially denied that anything happened between him and the child.  He ultimately admitted, however, that he had engaged in several sexual acts with the child on a regular basis beginning in September 2010.

By indictment No. 2011-073 (hereafter, first indictment), defendant was charged with 18 counts of sexual misconduct against the child (identified as M.A.).  The first five counts of the indictment (counts 1-5) charged defendant with rape in the first degree (Penal Law § 130.35 [3]), criminal sexual act in the first degree (two counts) (§ 130.50 [3]), aggravated sexual abuse in the third degree (§ 130.66 [1] [c]), and sexual abuse in the first degree (§ 130.65 [3]), all based upon the October 26, 2010 incident.  The indictment alleged that, on that date, defendant engaged in sexual intercourse with M.A., placed his mouth on her vagina, put his penis in her mouth, inserted a foreign object (a medicine dropper) into her vagina, and touched her vagina.  The next six counts of the indictment (counts 6-11) charged defendant with rape in the first degree based on conduct allegedly occurring on a weekly basis beginning the week of September 12, 2010 and ending the week of October 17, 2010.  Defendant was also charged with two counts of criminal sexual act in the first degree (oral sexual conduct) and one count of sexual abuse in the first degree (vaginal touching) based on alleged incidents occurring between October 1 and 25, 2010 (counts 12-14), as well as two counts of criminal sexual act in the first degree (oral sexual contact) and one count of sexual abuse in the first degree (vaginal touching) based on alleged incidents occurring between September 8 and September 30, 2010 (counts 15-17).  Finally, defendant was charged with endangering the welfare of a child (§ 260.10 [1]) (count 18) by subjecting M.A. to sexual contact between September 2009 and October 2010.

M.A.'s brother, J.A., then four, and their cousin, C.S., then six, thereafter made disclosures to the police.  By indictment No. 2011-145 (hereafter, second indictment), defendant was charged with course of sexual conduct against a child in the second degree (Penal Law § 130.80 [1] [a]) and endangering the welfare of a child (§ 260.10 [1]) based on the allegation that he engaged in two or more acts of sexual conduct with C.S. and "repeatedly subjected her to sexual contact" between October 2008 and October 2010 (counts 1 and 2).

Counts 3-5 charged defendant with sexual abuse in the first degree (§ 130.65 [3]) (two counts) and endangering the welfare of a child (§ 260.10 [1]) based upon allegations that between January 2010 and October 2010, defendant touched J.A.'s penis and buttocks.  The two indictments were consolidated over defendant's objection.

Defendant thereafter moved to suppress his statement to the police on the grounds that he lacked the capacity to knowingly and intelligently waive his *Miranda* rights, and that his mental limitations, combined with the police interrogation tactics, rendered his confession involuntary.  Defendant submitted the report of a forensic psychologist who examined defendant on two dates in June 2011, took his history, reviewed the videotape of the interrogation, and performed a number of psychological tests.  The defense expert opined that defendant was "not capable of intelligently waiving his *Miranda* [r]ights" due to his "cognitive and abstracting deficits," and that he was "a suggestible and overly compliant individual, . . . causing him to be easily intimidated by the interrogation process."

At the *Huntley* hearing, the People presented the expert testimony of a forensic psychiatrist who interviewed defendant in jail and reviewed the videotape of his confession.  The People's expert acknowledged that defendant was "intellectually handicapped," with a full-scale IQ of 68, but concluded that defendant was "not that retarded" and could understand his *Miranda* rights.  The defense expert testified that defendant's IQ placed him in the "mentally retarded range of intellectual functioning."  Defendant's verbal IQ was 63, which placed him in the first percentile, meaning that he performed worse than 99% of the test population.  Based upon defendant's "very poor" level of verbal functioning, the defense expert opined that, although defendant was "able to understand the words of the *Miranda* rights," he was "not capable of intelligently waiving" those rights.  He further opined that defendant was "a very suggestible and very compliant man as is not atypical of persons who are mentally retarded," which placed him at risk of falsely confessing.

The court denied defendant's motion, concluding that defendant knowingly, voluntarily, and intelligently waived his *Miranda* rights.  The court determined that, although defendant "has impaired intelligence and limited verbal comprehension ability," there was "no evidence of mental retardation so great as to render [him] completely incapable of understanding the meaning and effect of the confession."  The court further determined that the police conduct "did not overbear the defendant's will or . . . undermine his ability to make a choice whether or not to make a statement."

By its verdict, the jury convicted defendant of rape in the first degree (Penal Law § 130.35 [3]), criminal sexual act in the first degree (four counts) (§ 130.50 [3]), aggravated sexual abuse in the third degree (§ 130.66 [1] [c]), sexual abuse in the first degree (three counts) (§ 130.65 [3]), and endangering the welfare of a child (§ 260.10 [1]) as charged in counts 1-5, 12-14, and 17-18 of the first indictment.  The jury also convicted defendant of endangering the welfare of a child (§ 260.10 [1]) as charged in count 2 of the second

indictment.  Defendant now appeals.

II

It is well established that, "[f]or a statement to be admissible, the People must prove a voluntary, knowing, and intelligent waiver of the privilege against self-incrimination" (*People v Aveni*, 100 AD3d 228, 236, *appeal dismissed* 22 NY3d 1114; *see People v Rodney*, 85 NY2d 289, 292; *People v Williams*, 62 NY2d 285, 288).  "Whether a defendant knowingly and intelligently waived his or her rights to remain silent and to an attorney is determined upon an inquiry into the totality of the circumstances surrounding the interrogation" (*People v Santos*, 112 AD3d 757, 758, *lv denied* 22 NY3d 1158 [internal quotation marks omitted]; *see Williams*, 62 NY2d at 288), including the defendant's "age, experience, education, background, and intelligence, and . . . whether he [or she] has the capacity to understand the warnings given him [or her], the nature of his [or her] Fifth Amendment rights, and the consequences of waiving those rights" (*Fare v Michael C.*, 442 US 707, 725, *reh denied* 444 US 887).

Where a "person of subnormal intelligence" is involved, "close scrutiny must be made of the circumstances of the asserted waiver" (*Williams*, 62 NY2d at 289).  "A defendant's mental deficiency weighs against the admissibility of an elicited confession, so that any such confession must be measured by the degree of the defendant's awareness of the nature of the rights being abandoned and the consequences of the decision to abandon them" (*People v Dunn*, 195 AD2d 240, 242, *affd* 18 NY2d 956).  A suspect of "subnormal intelligence" may effectively waive his or her *Miranda* rights "so long as it is established that he or she understood the immediate meaning of the warnings" (*Williams*, 62 NY2d at 287), i.e., "how the *Miranda* rights affected the custodial interrogation" (*id.* at 289).  It must therefore be shown that the suspect "grasped that he or she did not have to speak to the interrogator; that any statement might be used to the subject's disadvantage; and that an attorney's assistance would be provided upon request, at any time, and before questioning is continued.  What will suffice to meet this burden will vary from one case to the next" (*id.*).

In addition to establishing the validity of a defendant's waiver of his or her *Miranda* rights, it is also "the People's burden to prove beyond a reasonable doubt that statements of a defendant they intend to rely upon at trial are voluntary" (*People v Thomas*, 22 NY3d 629, 641; *see People v Guilford*, 21 NY3d 205, 208).  "[C]onvictions following the admission into evidence of confessions which are involuntary, i.e., the product of coercion, either physical or psychological, cannot stand" (*Rogers v Richmond*, 365 US 534, 540).  Like the determination of whether a defendant effectively waived his or her privilege against self-incrimination, proof of voluntariness compatible with due process "takes into consideration 'the totality of all the surrounding circumstances—*both the characteristics of the accused and the details of the interrogation*' " (*Dickerson v United States*, 530 US 428, 434 [emphasis added]; *see Guilford*, 21 NY3d at

208).  The critical question is " 'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession" (*Dickerson*, 530 US at 434), which " 'depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing' " (*id.; see Thomas*, 22 NY3d at 642 [the voluntariness of a statement "depend[s] upon the facts of each case, both as they bear upon *the means employed and the vulnerability of the declarant*" (emphasis added)]).  Thus, the voluntariness inquiry "is not limited to instances in which the claim is that the police conduct was 'inherently coercive' " (*Miller v Fenton*, 474 US 104, 110).  Rather, it "applies equally when the interrogation techniques were improper only because, *in the particular circumstances of the case*, the confession is unlikely to have been the product of a free and rational will" (*id.* [emphasis added]).

## III

We turn first to defendant's contention that the People failed to establish beyond a reasonable doubt that he knowingly, voluntarily, and intelligently waived his rights to remain silent and to an attorney.  The record establishes and, indeed, it is undisputed, that defendant has significant cognitive deficits.  Defendant was classified as "mentally retarded" in school, and graduated with an Individualized Education Program diploma.  The defense expert testified at the *Huntley* hearing that defendant received a full-scale IQ score of 68 on the Wechsler Adult Intelligence Scale-IV (WAIS-IV), compared to an average score of 100, which placed him in the "[e]xtremely [l]ow range of intellectual functioning" and classified him as "[m]entally retarded" (*see Atkins v Virginia*, 536 US 304, 309 n 5 [describing an IQ below 75 as within the range of mental retardation]).  Defendant's IQ placed him in the second percentile, meaning that he "scored lower than did 98% of the people his age who were administered the WAIS-III during its development." Significantly, defendant received a verbal comprehension IQ score of 63, indicating a "very, very low, very poor" level of verbal functioning.  The defense expert testified at the *Huntley* hearing that defendant read at a second- or third-grade level, which he described at trial as "what we know as Dick and Jane ran up the hill, that kind of stuff."  He estimated that defendant's "comprehension of the words would be considerably lower than the third grade."

The defense expert also administered several tests that were specifically designed to assess defendant's understanding and appreciation of the *Miranda* warnings.  The defense expert testified that defendant's performance on those tests indicated that he "would have difficulty intelligently assessing [and] weighing the circumstances that he's involved in at a particular time."  Defendant scored "very poorly," i.e., in the second percentile, on the Function of Rights in Interrogation test.  According to the defense expert, that meant that, although defendant understood the individual words used in the *Miranda* warnings, he was unable to comprehend the import of the warnings or to "intelligently weigh the consequences" of waiving his rights.  The defense expert thus opined that, because of

defendant's "cognitive and abstracting deficits," he "was not capable of intelligently waiving his *Miranda* rights" (*see Fare*, 442 US at 725; *Dunn*, 195 AD2d at 242-243).

The People's expert, who admitted at trial that he had "limited experience in dealing with people with mental retardation," did not dispute defendant's IQ score or take issue with the specific tests administered by the defense expert. Indeed, he characterized the defense expert's report as "well balanced." He concluded, however, that defendant was "not that retarded." The People's expert noted that defendant "knew that there were seven days in a week" and that, although defendant thought that there were six months in a year, he was able to name all of the months. The People's expert did not assess defendant's reading ability or comprehension. The People's expert concluded that, because the *Miranda* rights "are fairly simple [and] straightforward," defendant was "able to understand the rights when they were read to him." His conclusion was primarily based upon the belief that defendant was "able to function" in the activities of daily living, including personal hygiene, driving and handling his SSI funds. According to the People's expert, defendant

> "could live alone. He had a girlfriend. He's been deemed able to handle his own funds. He could buy a truck. He could buy insurance for the truck. So, from my point of view and in talking to him, it was my feeling that, that he could understand the rights."

There is no evidence in the record, however, that defendant was able to live alone or that he had lived alone at any point in his life. Indeed, the record reflects that defendant lived with his parents into adulthood and that, after their death, he lived with other relatives and friends. There is likewise no evidence that defendant "had a girlfriend." Defendant told the police that he had never had a girlfriend, and the record contains no evidence to the contrary. Finally, there is no evidence that defendant was "deemed" or "found" competent by the Social Security Administration to handle his own funds; in that respect, the record establishes only that defendant was the payee on his SSI checks.

Of equal importance was the manner in which the rights were administered to defendant. The defense expert, who reviewed the videotape of the interrogation, noted that the *Miranda* warnings "were read to [defendant] in a relatively rapid fashion which likely only further confused him given his mental retardation." Our review of the videotape confirms that characterization. In delivering the *Miranda* warnings, the detective recited each of the rights at a fairly rapid pace, particularly as compared to the pace of the remainder of the interview. The detective then handed defendant a waiver of rights form with defendant's responses already filled in and asked defendant to place his initials next to each of the rights. Significantly, the detective never asked defendant whether he could read or write, and did not inquire about defendant's level of education. The defense expert concluded that defendant "could not read his [*Miranda*] [r]ights

on his own because of his 3rd grade reading level." Indeed, even the People's expert acknowledged that the detective "didn't spend a lot of time dwelling on the *Miranda* rights."

This case is thus distinguishable from *Williams* (62 NY2d at 287), in which the Court of Appeals concluded that a 20-year-old "functionally illiterate, borderline mentally retarded man" effectively waived his *Miranda* rights. The Court noted that "the detective who administered the *Miranda* warnings did not restrict himself to a mere reading of the rights from a card, as is usually done by police officers. Instead, the officer described the rights in more detail and simpler language, verifying that defendant understood each right before proceeding to the next warning" (*id.* at 288; *see id.* at 289 ["(T)o an individual of subnormal intelligence, stating the *Miranda* warnings in sophisticated terms would be as incomprehensible as though they were spoken in a foreign language . . . (T)he detective here was careful to reduce the warnings to simple terms that defendant could understand"]). No such precautions were taken in this case despite the clear indications, discernible on our review of the videotape, that defendant's intellectual ability was limited.

We therefore conclude, based upon the totality of the circumstances, that the People failed to meet their burden of establishing beyond a reasonable doubt that defendant knowingly, voluntarily, and intelligently waived his *Miranda* rights, and thus that the court should have suppressed defendant's confession on that ground (*see Santos*, 112 AD3d at 757-759; *Aveni*, 100 AD3d at 237).

IV

In addition to his *Miranda* contention, defendant contends that the People failed to meet their "heavy burden" of proving the voluntariness of defendant's statements beyond a reasonable doubt (*People v Holland*, 48 NY2d 861, 862; *see Thomas*, 22 NY3d at 641; *Guilford*, 21 NY3d at 208), and thus that the court should have suppressed his confession on that ground as well (*see Thomas*, 22 NY3d at 636). "[B]efore and apart from *Miranda*, courts have long held that a person's limited intellectual ability bears appreciably on the voluntariness of the person's response to interrogation" (*Dunn*, 195 AD2d at 243). People with intellectual disabilities are particularly "vulnerab[le] and susceptib[le] to overreaching" by law enforcement (*id.* at 244; *see Colorado v Connelly*, 479 US 157, 165 ["(M)ental condition is surely relevant to an individual's susceptibility to police coercion"]; *United States v Preston*, 751 F3d 1008, 1020 [noting that reduced mental capacity may render a suspect " 'more susceptible to subtle forms of coercion' "]), and are "more likely to give false confessions" (*Hall v Florida*, ___ US ___, ___, 134 S Ct 1986, 1993; *see Preston*, 751 F3d at 1018 n 13 [noting "abundant research that the intellectually disabled 'are more likely to confess falsely for a variety of reasons' "]). Thus, " '[o]fficial conduct that does not constitute impermissible coercion when employed with nondisabled persons may impair the voluntariness of the statements of persons who are mentally ill or mentally retarded' " (*Preston*, 751 F3d at 1016-

1017; *see Stein v New York*, 346 US 156, 185, *reh denied* 346 US 842 ["What would be overpowering to the weak of will or mind might be utterly ineffective against an experienced criminal"]).

Here, the defense expert opined that defendant is "a suggestible and overly compliant individual, which is not unusual in mentally retarded individuals who are frequently 'yea-saying,' in turn causing him to be easily intimidated by the interrogation process" (*see Preston*, 751 F3d at 1022 ["These traits–being 'easily confused,' 'highly suggestible and easy to manipulate'–are consistent with characteristics of the intellectually disabled in general"]). The People's expert acknowledged that "people with an IQ of 68 certainly can be suggestible and can have a need to be compliant." According to the defense expert, individuals who are "yea-sayers" are more likely to agree with a statement if repeatedly asked; thus, prodding or intensive questioning will tend to elicit an affirmative response. In addition to noting his own clinical impressions, the defense expert administered tests specifically designed to measure interrogative susceptibility and compliance, i.e., the "Gudjonsson scales." On the suggestibility scale, defendant scored a 15, which is "higher than the normative data provided for adults, court referrals, and persons with intellectual disabilities, whose average 'total suggestibility' scores were 7.5, 10.9 [and] 12.5 respectively." Defendant also scored a 15 on the compliance scale, much higher than the average score of 9 and higher than "the average score for false confessors," i.e., 14.4. According to the defense expert, a person with a score of 15 on the compliance scale would be particularly sensitive to threats and promises made during interrogation. He thus opined, based upon his interview and the test results, that defendant "falls within the parameters of a person who is in danger of false confessions."

We have reviewed the videotape of the interrogation and are therefore " 'not consigned to an evaluation of a cold record, or limited to reliance on the detectives' testimony' " (*Preston*, 751 F3d at 1020). Our review confirms the defense expert's observation that the detective "used techniques that are popularly used in convincing someone to answer questions in a particular way." Specifically, the detective "tried to appear to be a friendly soul, a good cop that might do something to help [defendant] if he gave the correct answer." The detective told defendant that he "knew he wasn't a bad guy"; asked defendant whether he was "an evil man" or "a guy that has a problem that we need to try and fix"; and told defendant "[y]ou don't want people to think that you're an evil person . . . I might be able to help you" (*see id.* at 1023-1024 [concluding that the confession of an intellectually-disabled defendant was involuntarily given where, among other things, the police asked defendant "to choose . . . whether he was a monster–a sexual predator who repeatedly preys on children–or if the abuse of the child was a one-time occurrence"]). Most of the detective's questions were leading in nature, and he repeated a question when he was not satisfied with defendant's response, urging defendant to "be honest" with him and to tell the truth (*see id.* at 1024 ["(W)hen presented with leading or suggestive questions," people with intellectual disabilities " 'frequently seek to conform to the perceived desires of the interrogator' "]; *Wilson v Lawrence County*,

260 F3d 946, 953 [confession involuntary where, inter alia, "the officers relied largely on leading questions to secure th[e] confession"]).  Notably, the People's expert testified at trial that, when interviewing a suggestible subject, it is important not to ask leading questions "[b]ecause they will think that's what [you] want to hear and people are liable to say yes or be agreeable, so forth."

As the defense expert testified at trial, "[w]hat became very clear in the video . . . was that [defendant] changed his answers based on the kind of questioning that was done to him.  In other words, he was asked the question, the same question over and over again.  So it no doubt became clear to him that he was answering the wrong way.  So he changed his answers to be what he believed the cop wanted to know."  Many, although not all, of defendant's responses consisted of "mmm-hmm," yes, and a parroting back of the detective's statements.  The detective also told defendant that he had spoken to the victim and her mother, that the victim was "not lying," and that the medical examination was going to show that "something happened" between defendant and the victim.  The defense expert testified that such tactics "would lead [defendant] to question his own memory of the situation which isn't good to begin with.  He's got deficits in memory.  So if presented with memory that would counteract what he believed to be true, he would change his answer."

We therefore conclude, based upon the totality of the circumstances, including defendant's intellectual limitations, his suggestibility and compliance tendencies, and the tactics employed by the interviewer in this case, that defendant's confession was not voluntary and thus that it should have been suppressed on that ground as well (*see Preston*, 751 F3d at 1027-1028; *see generally Dickerson*, 530 US at 434; *Miller*, 474 US at 110; *Thomas*, 22 NY3d at 642).  Thus, we conclude that the judgment should be reversed, defendant's confession suppressed, and a new trial granted (*see People v Cotton*, 280 AD2d 188, 193, *lv denied* 96 NY2d 827).

V

Defendant further contends that his conviction is not supported by legally sufficient evidence and that the verdict is against the weight of the evidence.  We agree in part.  Because there was no evidence, other than defendant's confession, that the crimes charged in counts 12, 13, 14 and 17 of the first indictment "were, in fact, committed" (*People v Whitney*, 105 AD2d 1111, 1112; *see People v Chico*, 90 NY2d 585, 589-590), we agree with defendant that those counts must be dismissed (*see People v Maldonado*, 40 AD3d 436, 436; *Whitney*, 105 AD2d at 1112).  We further agree with defendant that the verdict with respect to counts 1, 2, and 3 of the first indictment is against the weight of the evidence (*see generally People v Bleakley*, 69 NY2d 490, 495), and we therefore dismiss those counts as well.  Although the physical evidence establishes that defendant ejaculated and that some of the ejaculate ended up on the victim's shirt, no sperm or seminal fluid was detected on any of the samples taken from the victim's body.  Further, the victim's sexual assault examination was "normal," with "no tears, notches, tags, [or] bruises" detected on the hymen.

Contrary to the contention of defendant, we conclude that his conviction of the remaining counts in the two indictments is supported by legally sufficient evidence, and that the verdict with respect to those counts is not against the weight of the evidence (*see generally Bleakley*, 69 NY2d at 495).  In light of our determination that defendant is entitled to a new trial based upon the improper admission of his confession, we do not reach defendant's remaining contentions.

VI

Accordingly, we conclude that the judgment in appeal No. 1 should be reversed, that part of the omnibus motion seeking to suppress defendant's statements granted, counts 1, 2, 3, 12, 13, 14 and 17 of the first indictment dismissed, and a new trial on counts 4, 5 and 18 in the first indictment granted.  We likewise conclude that the judgment in appeal No. 2 should be reversed, that part of the omnibus motion seeking to suppress defendant's statements granted, and a new trial on count 2 of the second indictment granted.

Entered:  November 14, 2014                    Frances E. Cafarell
                                               Clerk of the Court