People v Patillo (2020 NY Slip Op 03754)





People v Patillo


2020 NY Slip Op 03754


Decided on July 2, 2020


Appellate Division, First Department


Manzanet-Daniels, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on July 2, 2020
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Rolando T. Acosta, P.J.
Rosalyn H. Richter
Sallie Manzanet-Daniels
Judith J. Gische
Barbara R. Kapnick, JJ.


1518/12 11415 

[*1]The People of the State of New York, Respondent,
v
Darrell Patillo, Defendant-Appellant.



Defendant appeals from the judgment of the Supreme Court, Bronx County (John S. Moore, J.), rendered June 19, 2014, convicting defendant, upon his plea of guilty, of murder in the second degree and attempted murder in the second degree, and imposing sentence.




Christina A. Swarns, Office of The Appellate Defender, New York (Stephen Chu and Kami Lizarraga of counsel), for appellant.
Darcel D. Clark, District Attorney, Bronx (Justin J. Braun and Ryan J. Foley of counsel), for respondent.



MANZANET-DANIELS, J.


The evidence showed defendant to be suffering from significant intellectual disability. Under these circumstances, the court was under an obligation to engage in a more probing colloquy to ensure that defendant understood the ramifications of entering a guilty plea and of waiving his right to appeal. We accordingly vacate his plea in the interest of justice and remand for further proceedings.
By definition, an intellectual disability involves deficits in intellectual and adaptive functioning (see Hall v Florida, 572 US 701, 709-710 [2014]; Atkins v Virginia, 536 US 304, 318 [2002]). It is characterized by "deficits in general mental abilities," together with "impairment in everyday adaptive functioning" that emerges during childhood (Diagnostic and Statistical Manual of Mental Disorders, at 37 [5th ed 2013]). The IQ threshold for intellectual disability is 70, well below the mean IQ of 100. The threshold between mild and moderate [*2]intellectual disability falls around 50-55.
People with intellectual disabilities possess "diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others" (Atkins, 536 US at 318). They are overly compliant and frequently "yea-saying" (People v Knapp, 124 AD3d 36, 46 [4th Dept 2014] [internal quotation marks omitted]). They are "easily confused, highly suggestible, and easy to manipulate" (id. [internal quotation marks omitted]).
These traits render people with intellectual disabilities uniquely vulnerable to injustice within criminal proceedings. They are more likely to give false confessions and less able to meaningfully assist their counsel (see Hall, 572 US at 709). An intellectually disabled defendant must possess the capacity to appreciate the nature and consequences of his or her conduct and that it was wrong (see Penal Law § 40.15). He cannot be convicted if he lacks capacity to understand the proceedings against him or to participate in his own defense (see CPL 730.10[1]). Even if he has sufficient understanding to be held responsible, a court must account for his diminished mental capacity in ensuring that any waiver of constitutional rights is knowing, intelligent and voluntary (see People v Bradshaw, 18 NY3d 257, 266 [2011] [trial court was obliged to "give defendant a thorough explanation" and to ensure that "defendant fully grasped the nature of this fundamental right that he was foregoing," in light of the defendant's background and history of mental illness]).
Defendant's psychological assessments cast serious doubt about his ability to enter a knowing and voluntary plea. DOE records showed defendant to have been diagnosed as mentally retarded and to suffer from "severe academic delays." The records indicated that with an IQ of only 56, defendant had "extremely low" "general cognitive ability," with "overall thinking and reasoning abilities" in the bottom 0.2%. Those records further indicated that defendant's verbal comprehension, perceptual reasoning, working memory, and processing speed were "extremely low," in the bottom 0.2 to 2%.
The CPL 390 report, ordered by the trial court in aid of sentencing, confirmed the doubts regarding defendant's mental capacity and ability to understand or participate in the proceedings. Doctors at Bellevue observed defendant to suffer from an intellectual disability with "extremely low" intellectual functioning. Defendant's IQ placed him in the bottom one percentile as compared to his peers. The report noted that defendant's limited cognitive abilities placed him at increased risk of impulsive behavior without regard to the consequences of his actions.
"[E]vidence of a defendant's irrational behavior" and his demeanor at trial are relevant considerations in determining whether further inquiry into his competence is required (Drope v Missouri, 420 US 162, 180 [1975]). In view of the records showing defendant's limited cognitive abilities, his refusals to attend court or to consult with his lawyer provide further reason to doubt his competence and belie an ability to enter a knowing and voluntary plea and to assist in his defense. At sentencing, the court itself commented on defendant's refusals to appear in court and "difficult" behavior. The court believed this to be indicative of defendant's sociopathy; however, defendant's refusal to participate in the proceedings was likely reflective of his diminished mental capacity. The court's singular perspective appears to have caused it to overlook contemporaneous assessments and other evidence of defendant's intellectual disability.
A trial court bears the responsibility to confirm that a defendant's plea is "knowing, intelligent and voluntary" and thus "ensure that a criminal defendant receives due process before pleading guilty and surrendering his or her most fundamental liberties to the State" (People v Peque, 22 NY3d 168, 184 [2013], cert denied 574 US 840 [2014]). Courts must ensure the knowingness and voluntariness of each plea based on the totality of circumstances, including the "age, experience and background of the accused" (People v Vickers, 84 AD3d 627, 628 [1st Dept 2011] [internal quotation marks omitted]). Information in the court records may warrant a "more [*3]probing inquiry," particularly where the record alerts the court to a defendant's "mental illness or other defect which might call into question his ability to apprehend the effect of his statements" (People v Palmer, 159 AD3d 118, 122 [1st Dept 2018]).
A more probing inquiry was warranted here to ensure that defendant understood the constitutional rights he was waiving, given his significant intellectual disability. The court knew, based on the records, that defendant's intellectual functioning was "extremely low," with "overall thinking and reasoning abilities" and "verbal comprehension" falling in the bottom 0.2 and 0.5 percentile. Bellevue's assessment placed defendant's "word knowledge and language development" at less than 0.1 percentile.
In light of this information, the court should have known that the standard plea allocution would be near incomprehensible to defendant. Yet the court made no effort to translate the standard litany into simple language that would be understandable to someone with defendant's limited capacities.
Under the circumstances, defendant's plea could not have been knowing and voluntary. Where the court has reports from mental health professionals detailing a defendant's mental capacity, the court should be alerted to ensure that the defendant understands the nature of the fundamental rights he is waiving (see e.g. People v Cleverin, 140 AD3d 1080, 1082 [2d Dept 2016] [mentally-retarded defendant with an IQ of 53 did not knowingly and voluntarily waive his Miranda rights]).
The allocution was not salvaged by defendant's mechanistic recitation of "yes" in response to the court's questions. People with intellectual disabilities are, by virtue of their disability, easily confused, suggestible, and susceptible to manipulation (see Knapp, 124 AD3d at 46). As a result, mentally retarded persons are "frequently yea-saying" and "intensive questioning will tend to elicit an affirmative response" (id.). Defendant's recitation of "yes" to the court's questions during his allocution in no way demonstrated his comprehension of the plea or that he was voluntarily waiving his rights.
Accordingly, the judgment of the Supreme Court, Bronx County (John S. Moore, J.), rendered June 19, 2014, convicting defendant, upon his plea of guilty, of murder in the second degree and attempted murder in the second degree, and sentencing
him to an aggregate term of 20 years to life, should be reversed, in the interest of justice, the plea vacated, and the matter remanded for further proceedings.
All concur.
Judgment, Supreme Court, Bronx County (John S. Moore, J.), rendered June 19, 2014, reversed, in the interest of justice, the plea vacated, and the matter remanded for further proceedings.
Opinion by Manzanet-Daniels, J. All concur.
Acosta, P.J., Richter, Manzanet-Daniels, Gische, Kapnick, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: JULY 2, 2020
CLERK