People v Watt (2020 NY Slip Op 07721)





People v Watt


2020 NY Slip Op 07721


Decided on December 22, 2020


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: December 22, 2020

Before: Manzanet-Daniels, J.P., Gesmer, Kern, Oing, Moulton, JJ. 


Index No. 5224/14 Appeal No. 12676 Case No. 2018-2739 

[*1]The People of the State of New York, Respondent,
v
Kevon Watt, Defendant-Appellant.


Robert S. Dean, Center for Appellate Litigation, New York (Emilia King-Musza of counsel), for appellant.
Cyrus R. Vance, Jr., District Attorney, New York (Nathan Shi of counsel), for respondent.



Order, Supreme Court, New York County (Daniel Fitzgerald, J.), rendered September 19, 2017, convicting defendant, upon his plea of guilty, of attempted murder in the second degree (Penal Law §§ 110, 125.25[1]) and robbery in the first degree (Penal Law § 160.15[1]), and sentencing him to two concurrent terms of 14 years in prison, to be followed by 5 years of postrelease supervision, modified, as a matter of discretion in the interest of justice, to the extent of reducing the concurrent prison terms to 10 years, and otherwise affirmed.
We reduce defendant's sentence under our interest of justice powers, as we do not find an abuse of discretion by the sentencing judge. We also do so mindful of the horrific nature of the crime, described more fully below. Notwithstanding that, we reduce his sentence in view of defendant's significant personal limitations, which we conclude would make it unjust for him to be sentenced to a longer period of incarceration than two of his codefendants.
The following history is gleaned from the record before us, which contains, among other items, defendant's CPL article 730 examinations and other psychological evaluative reports: Since his childhood, defendant's life has been plagued by mental illness and intellectual disability. At the age of five, defendant was diagnosed with ADHD and an emotional disturbance. Beginning in the first grade, he started attending special educational schools. At seven, he was prescribed antidepressant medication often used to treat anxiety. At eight, he began taking an antipsychotic medication normally prescribed to treat schizophrenia and symptoms of bipolar disorder. At nine, defendant began having auditory hallucinations. At 15, he started high school and began getting into fights with other students who purportedly picked on him. One such fight ended with defendant's arrest and an adjudication as a youthful offender. At 16, he was diagnosed with selective mutism, a childhood anxiety disorder characterized by a child's inability to effectively speak and communicate in social settings. At 17, he underwent a psychological evaluation and was assessed a full scale IQ score of 48, which, according to the evaluating doctor, was "well below the 1st percentile, placing his level of cognitive functioning within the Moderate Mental Retardation range." The evaluation also noted that defendant possessed a second grade reading level. That same year, the New York City Department of Education amended defendant's educational program to provide for only home school instruction. He would never return to a school building. It was around this time that defendant started spending time with individuals from his community, including codefendant Christian Torres, who held himself out as a friend to defendant. Defendant soon began drinking heavily, reportedly at the urging of his companions, and was hospitalized on one occasion for alcohol poisoning.
On the night of November 6, 2014, defendant[*2], then 19, and his codefendants, Torres, Alexis Reddrick, and Whitney Byrd, went to Riverside Park, where they encountered a man sitting on a bench. The four surrounded the man, and Torres smashed a large rock on his head. All four codefendants then kicked the man. Someone in the group took the man's iPhone, laptop, and wallet. The man suffered bleeding to the brain, a broken nose, facial fractures, and an open wound on the back of his head requiring 15 stitches. The group then walked further into the park, where they saw a homeless man sleeping on a park bench. Torres hit the man in the face and all four repeatedly hit the man. The man was then thrown into the Hudson River where the group threw rocks at him. The man was able to cling onto a riverbank overnight and was rescued in the morning. He suffered a broken jaw, broken leg, multiple abrasions, and hypothermia, which required a month-long stay in the hospital.
A grand jury charged defendant, Torres, Reddrick, and Byrd with two counts each of attempted murder in the second degree, gang assault in the first degree (Penal Law § 120.07), assault in the first degree (Penal Law § 120.10), robbery in the first degree, and robbery in the second degree (Penal Law § 160.10[1]), and one count each of grand larceny in the fourth degree (Penal Law § 155.30[4]).
While awaiting trial, defendant was detained in a mental observation unit on Rikers Island and underwent two CPL article 730 examinations. Rikers designated him as someone with "a severe and persistent mental illness" and diagnosed him with "Mood Disorder NOS, Psychiatric Disorder Problem, Impulse Control Disorder NOS, Adjusting Disorder with Anxiety/Depression, Bipolar Disorder NOS." He told his CPL article 730 examiners that, since being at Rikers, he had attempted suicide 35 times using methods like cutting his wrists with a broken cup, punching himself in the face, and repeatedly banging his head against the wall. He stated that he continued to hear the voices that had plagued him since his childhood, despite being prescribed antipsychotic medication.
As noted above, defendant pled guilty to attempted murder in the second degree and robbery in the first degree and was sentenced to 14 years in prison followed by 5 years of postrelease supervision. Torres pled guilty to two counts of attempted murder in the first degree and was sentenced to an aggregate prison term of 14 years in prison followed by 5 years of postrelease supervision. Reddick and Byrd each pled guilty to two counts of robbery in the first degree and were each sentenced to an aggregate prison term of 10 years in prison followed by 5 years of postrelease supervision.
We now reduce defendant's prison sentence to 10 years and otherwise affirm. (see People v Rosenthal, 305 AD2d 327, 329 [1st Dept 2003] [this Court "possesses broad, plenary powers to modify a sentence that is unduly harsh or severe under the circumstances, in the interest of justice, even though the sentence [*3]falls within the permissible statutory range"], citing People v Delgado, 80 NY2d 780, 783 [1992]).
This Court takes very seriously the severity of the injuries inflicted on the two victims in this case, and our reduction of defendant's prison sentence in no way diminishes our horror at the pain and suffering they endured at the hands of defendant and his codefendants. However, based on the record before us, we find that defendant presents an extraordinary circumstance meriting the use of our interest of justice powers to reduce his prison sentence.
First, the record unequivocally shows that defendant has suffered intellectual and mental deficiencies since his childhood, which our Court has held renders a defendant's conduct less blameworthy (see People v Reyes, 89 AD3d 401 [1st Dept 2011][reducing sentence for second degree murder from 11 to 8 years for defendant with mental illness]); see also People v Nealon, 36 AD3d 1076, 1079 [3d Dept 2007], lv denied 8 NY3d 988 [2007][reducing sentence for criminal sale of a controlled substance in the third degree from 10- to 20-years to 6- to 12-years where defendant suffered from "mitigating psychological disorders"]). Second, defendant's cognitive disabilities rendered him overly susceptible to influence and manipulation (see People v Patillo, 185 AD3d 46, 50 [1st Dept 2020][citation omitted]["People with intellectual disabilities are, by virtue of their disability, easily confused, suggestible, and susceptible to manipulation"]). Here, prior to the incident defendant had no felony or misdemeanor convictions and only one youthful offender adjudication stemming from a school fight. For the first 19 years of his life, defendant exhibited no inclination towards committing crime, let alone violent crime. This strongly suggests that defendant's association with codefendant Torres, which began just one to two years prior to the incident, played an outsize influence on defendant and his role in the attacks. Third, defendant was 19 at the time of the incident, which, in combination with his cognitive deficiencies, rendered him even more susceptible to negative influences (see Roper v Simmons, 543 US 551, 569 [2005][ 17-year old "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure"]). We have long held that a defendant's young age may render the individual less culpable (see People v Yturrino, 125 AD2d 277 [1st Dept 1986][reducing 19-year-old's manslaughter sentence from 3 1/3 to 10 years to 2 to 6 years based in part on her age]; Thompson v Oklahoma, 487 US 815, 835 [1988][explaining that a juvenile's transgression "is not as morally reprehensible as that of an adult"]). Finally, in research cited by defendant, people with serious psychiatric disorders are more likely to be violently victimized and housed in segregation while incarcerated.[FN1] As defendant himself stated in his CPL article 730 examination, he attempted suicide over 35 times [*4]while at Rikers Island. We find, therefore, that an extended term of incarceration would have an extremely harsh impact on defendant.
These factors, in their totality, demonstrate an extraordinary circumstance warranting a reduction in defendant's prison sentence. Therefore, in the interest of justice, we reduce defendant's sentence to match the prison sentences of his codefendants Reddrick and Byrd, each of whom are serving an aggregate prison term of 10 years.
All concur except Oing, J. who dissents in a memorandum
as follows:




OING, J. (dissenting)
 

The majority's factual recitation accurately portrays the circumstances of the two brutal assaults, and need not be repeated. The indictment charged defendant and his three codefendants with 11 crimes: two counts of attempted second-degree murder, two counts of first-degree gang assault, two counts of first-degree assault, two counts of first-degree robbery, two counts of second-degree robbery, and one count of fourth-degree grand larceny. Defendant pleaded guilty to only two counts: one count of attempted second-degree murder and one count of first-degree robbery. In exchange for his plea, he received a sentence of a concurrent prison term of 14 years, followed by 5 years of postrelease supervision.[FN2] Had defendant been convicted after trial, he could have received a prison term of up to 25 years on each of the four class-B violent felonies.
On appeal, defendant concedes that the sentence imposed by the court was not an abuse of discretion. Nor can he, given that defendant entered into a negotiated plea and agreed upon sentence, and did so with the advice of counsel. There is no claim that the plea was anything other than voluntarily, knowingly and freely entered into. There is also no claim that defendant was anything but fully competent when he entered his guilty plea. In fact, defendant underwent four CPL 730 examinations, in which one psychiatrist evaluated him twice and two others evaluated him once each. Their medical opinion was that defendant was fit to proceed and participate in the pretrial proceedings. In particular, their reports came to virtually the same conclusion: defendant was aware of the risks and benefits of going to trial versus accepting a plea, the concept of a plea bargain, the expressed desire to work out a plea agreement, and his ability to interact well with his counsel, having no concerns about her representation. The sole basis for defendant's appeal is that his sentence is excessive in light of his limited cognitive abilities, and mental illnesses, all of which were before the court. He now urges us to reconsider the same evidence, and reduce his sentence in the interest of justice. Defendant does not, however, seek to have his sentence reduced to correspond with the 10-year prison term imposed on two of his codefendants. Instead, he seeks to have his sentence reduced to the minimum of 5 years incarceration and 2 1/2 years post-release supervision in [*5]the interest of justice. Given that defendant has been incarcerated since November 12, 2014, the date of his arrest, this reduction would result in defendant's eligibility for release.
Finding no abuse of discretion by the court, the majority has decided to reduce defendant's sentence, not in accordance to the 5 year minimum term that he seeks, but to a term commensurate with his co-defendants' 10 year imprisonment. The majority in exercising its interest of justice powers concluded that "defendant's significant personal limitations . . . would make it unjust for him to be sentenced to a longer period of incarceration than two of his co-defendants," that "an extended term of incarceration would have an extremely harsh impact on defendant" in light of his age and cognitive and mental limitations, and that "[t]hese factors, in their totality, demonstrate an extraordinary circumstance warranting a reduction in defendant's prison sentence."
Although I concur with the majority that the sentence imposed by the court was not an abuse of discretion given the uncontroverted record underlying defendant's plea, I respectfully disagree with the majority's decision to reduce defendant's sentence pursuant to our interest of justice powers because the facts herein do not support resort to such authority.
The principle is well settled that an appellate court has broad, plenary power to reduce a negotiated sentence that falls within the permissible statutory range if it finds the sentence to be unduly harsh or severe (People v Delgado, 80 NY2d 780, 783 [1992]) and where extraordinary circumstances warrant such a reduction (People v Fair, 33 AD3d 558 [1st Dept 2006], lv denied 8 NY3d 945 [2007]).
Defendant's argument is clear and succinct:
"Keeping Mr. Watt in prison for an extended period of time would be cruel and unnecessary. Mr. Watt requires extensive treatment and assistance for his mental health needs and cognitive disabilities, which he is almost certainly unable to receive in prison.[] Keeping Mr. Watt incarcerated for 14 years, the length of his current sentence, would do incredible damage to his psyche that he may not recover from . . ."
The issue then is not whether the 14 year agreed upon sentence is harsh and severe. Rather, the issue is whether defendant's known mental illnesses and limited cognitive abilities at the time he was sentenced currently present extraordinary circumstances rendering his continued 14 year incarceration pursuant to his plea agreement unduly harsh and severe so as to warrant a sentence reduction to 10 years. A determination of this issue, however, cannot be made on this record because it contains no evidence, medical or psychiatric, concerning defendant's present condition (see e.g. CPL 460.60). That said, the majority's decision to reduce defendant's 14-year term to a 10-year term, which is clearly significant and cannot be discounted, would be based solely upon sympathy and would not meaningfully address the purported [*6]urgency of defendant's situation. Based on the foregoing, the extraordinary circumstances that would warrant a reduction have not been demonstrated. Accordingly, the sentence should not be disturbed.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: December 22, 2020



Footnotes

Footnote 1: David Cloud and Chelsea Davis, Treatment Alternatives to Incarceration for People with Mental Health Needs in the Criminal Justice System: The Cost-Saving Implications, Vera Institute of Justice: Substance Use and Mental Health Program (2013), http://www.ncdsv.org/images/Vera_TreatmentAlternativesToIncarcerationForPeopleWithMHNeedsInTheCJS_2-2013.pdf [last accessed Nov. 22, 2020].

Footnote 2: Codefendant Torres pleaded guilty to two counts of second-degree attempted murder and was also sentenced to a prison term of 14 years, followed by 5 years of post-release supervision. Codefendants Reddrick and Byrd each pleaded guilty to two counts of robbery in the first degree and were both sentenced to a prison term of 10 years, followed by 5 years postrelease supervision.