THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
ROBERT MATTHEWS, Appellant.

Fourth Department, July 12, 1989

## APPEARANCES OF COUNSEL

*Gerald T. Barth (J. Scott Porter* of counsel), for appellant.

*Robert E. Wildridge, District Attorney (Edward McQuat* of counsel), for respondent.

## OPINION OF THE COURT

CALLAHAN, J.

We are concerned on this appeal with the propriety of the conviction of defendant, a mentally retarded person, for second and fourth degree arson and two counts of felony murder.

On October 17, 1985 defendant Robert Matthews, Jr. was 17 years old and possessed an IQ of 68. He resided with his parents in a camper parked adjacent to the home of his aunt and uncle, Joseph and Lourna Lounsberry, on Ellison Road in the Town of Lysander. Members of the Lounsberry family,

along with defendant's brother, were asleep in the residence when a fire broke out at about 4:00 A.M. Everyone escaped except defendant's aunt Lourna who suffered extensive burns and later succumbed from the injuries caused by the fire. Fire investigators quickly determined that the fire was of an incendiary nature. Since defendant was also known to have been staying in the house that night a search of the house and vicinity was conducted for him.

The pretrial *Huntley* hearing *(see, People v Huntley,* 15 NY2d 72) reveals that after the police located defendant, he agreed to accompany them to the Public Safety Building in Syracuse. Before the interview commenced, defendant was advised of his constitutional rights in accordance with *Miranda v Arizona* (384 US 436). He indicated that he understood his rights and was willing to speak with the officers. Shortly after the interview began, defendant admitted his involvement in starting the fire.

Defendant sought to suppress his statement to the police on the ground that he did not knowingly and intelligently waive his *Miranda* rights. At the *Huntley* hearing, defendant called a psychologist, Dr. Blumetti, who testified that defendant, because of his low intellectual capacity, was incapable of knowingly and intelligently waiving his constitutional rights. The suppression court concluded that although defendant was of subnormal intelligence, he was able to understand and knowingly waive his constitutional rights. Therefore, the court denied defendant's motion to suppress his statement.

In reviewing the suppression order, great weight must be accorded to the court's determination because of its ability to view and assess the credibility of witnesses *(People v Prochilo,* 41 NY2d 759, 761; *People v Bucknor,* 140 AD2d 705, *lv denied* 72 NY2d 1043; *People v Hoyer,* 140 AD2d 853, *lv denied* 72 NY2d 919). "An effective waiver of *Miranda* rights may be made by an accused of subnormal intelligence so long as it is established that he or she understood the immediate meaning of the warnings" *(People v Williams,* 62 NY2d 285, 287; *People v Hoyer, supra; People v Millington,* 134 AD2d 645, *lv denied* 70 NY2d 934). Whether the defendant knowingly and intelligently waived his rights is a factual question to be determined by the totality of the circumstances, which includes the defendant's limited mental capacity as but one factor *(People v Williams, supra; People v Bucknor, supra; People v Gerald,* 128 AD2d 635, *lv denied* 70 NY2d 646; *People v Miles,* 115 AD2d 962, *lv denied* 67 NY2d 654).

The record reveals many factors which support the court's finding of an effective waiver. There was testimony that defendant had been arrested on two previous occasions, and his prior experience with law enforcement may be considered on the question of whether he understood his rights and voluntarily chose to waive them *(People v Lippert,* 138 AD2d 770; *People v Millington, supra; People v Munoz,* 134 AD2d 532, *lv denied* 70 NY2d 958; *People v Gates,* 101 AD2d 635). The police officers testified that defendant expressed a willingness to speak to them and appeared to understand what was being said to him and responded appropriately *(see, People v Millington, supra; People v Medina,* 123 AD2d 331, 332; *People v Brundige,* 43 AD2d 1009; *People v Blocker,* 31 AD2d 885). Also Dr. Blumetti testified that, despite his limitations, defendant was capable of being gainfully employed and functioning in society *(see, People v Miles, supra; People v Tigner,* 48 AD2d 762; *People v Chaffee,* 42 AD2d 172; *People v Lux,* 34 AD2d 662, *affd* 29 NY2d 848).

At trial, the People established that the fire at the Lounsberry home was an arson fire, and that defendant had admitted setting the fire. The remainder of the trial focused on defendant's mental condition.

Dr. Cavanaugh, a pediatrician, who had conducted a physical examination of defendant about a year before the fire, testified that defendant had Klinefelter's syndrome, a condition caused by an extra "X" chromosome, which usually results in mild mental retardation. On cross-examination he acknowledged that as part of his examination, a routine history questionnaire was filled out by defendant's mother. Although the doctor stated that he did not consider this history in making his diagnosis, the court permitted the doctor, over defense objection, to read the following portion therefrom: "He doesn't mind, is always threatening that he's going to burn down my house, that he is going to kill his father and myself. He swears all the time. He can't get along with anyone. He is hitting and breaking and punching holes in the walls. Sometimes he tries to smother his younger brother. Also, the night he was put in Hutchings, he said he was going to take gas out of my car and throw it around our bed * * * and burn us up. Also, he steals and tries to sell things out of the house and he can't be trusted by himself."

The jury convicted defendant of arson in the second degree (Penal Law § 150.15), arson in the fourth degree (Penal Law

§ 150.05) and two counts of felony murder in the second degree (Penal Law § 125.25 [3]).

Prior to sentencing, defendant sought to be reexamined, free of antipsychotic medication, to determine whether the medication could have masked a mental disease or defect on which an insanity defense could have been based. In support of his motion, defendant submitted an affidavit by Dr. Blumetti in which he averred that when he examined defendant as to his mental capacity, he was unaware that defendant had been taking any medication. Thereafter, he learned that defendant had been taking medication that could possibly have "covered up" a mental condition that would have qualified for the insanity defense. Dr. Blumetti indicated that in order to obtain a fair and accurate assessment of defendant's mental state, it would be necessary to take him off the medication for a period of time and thereafter examine him in an unmedicated state. The court denied this application.

Defendant had made a similar application prior to trial which was likewise denied. At that time, defendant's counsel sought an adjournment for the purpose of conducting a second psychological evaluation. We acknowledge that the granting of an adjournment for any purpose is a matter within the trial court's discretion (People v Spears, 64 NY2d 698, 699-700; Matter of Anthony M., 63 NY2d 270, 283; People v Wood, 129 AD2d 598, lv denied 70 NY2d 719). Where the right of the defendant to prepare his case is involved, however, that discretionary power is more narrowly construed (People v Spears, supra; People v Foy, 32 NY2d 473, 477-478; People v Congilaro, 60 AD2d 442, 452). The application for reexamination was made prior to trial, when any prejudice resulting from a brief delay would have been minimal, and where the denial of defendant's application may have effectively deprived him of a defense (see, People v Foy, supra, at 478).

■ We conclude that the trial court's refusal to order his reexamination in an unmedicated state violated defendant's due process right to present a defense. While we can find no authority directly addressing this issue, there is precedent dealing with the question of whether a criminal defendant who raises an insanity defense has a right to have the jury view him in a drug-free condition. It has been held that the fundamental constitutional right to present a defense includes the defendant's right to present his or her demeanor in an unmedicated state when sanity is at issue (see, Commonwealth v Louraine, 390 Mass 28, 453 NE2d 437; State v Maryott, 6

Wash App 96, 492 P2d 239) or to at least inform the jury of the effects of the medication during trial *(see, People v Hardesty,* 139 Mich App 124, 362 NW2d 787, *appeal dismissed* 477 US 902; *In re Pray,* 133 Vt 253, 336 A2d 174; *see generally,* Gutheil and Appelbaum, *"Mind Control," "Synthetic Sanity," "Artificial Competence," and Genuine Confusion: Legally Relevant Effects of Antipsychotic Medication,* 12 Hofstra L Rev 77, 89-98).

We believe that an even stronger argument can be made for recognition of a defendant's right to be examined by an expert in an unmedicated state. A pretrial psychological examination does not involve the problems associated with allowing a defendant to appear at trial medication-free—i.e., there is no danger that withdrawing medication to allow the defendant to support an insanity defense will at the same time destroy his competence to stand trial *(see, People v Hardesty, supra; State v Law,* 270 SC 664, 244 SE2d 302; *State v Jojola,* 89 NM 489, 553 P2d 1296). Furthermore, because the purpose of antipsychotic medication is to eliminate psychotic symptoms *(see, Rivers v Katz,* 67 NY2d 485, 490, n 1), an accurate appraisal of defendant's mental condition requires a drug-free examination.

█ The trial court also erred in permitting Dr. Cavanaugh to testify about the history portion of defendant's hospital record which contained a highly prejudicial reference to a prior arson threat by defendant. This history was prepared by defendant's mother and was clearly hearsay *(see, People v Brensic,* 70 NY2d 9, 14). It is readily apparent that it contained material relating to prior threats of arson and other uncharged crimes. Evidence of similar uncharged crimes has probative value, but as a general rule it is excluded for policy reasons because it may induce a jury to convict because of defendant's history *(see, People v Lewis,* 69 NY2d 321, 325; *People v Allweiss,* 48 NY2d 40, 46). It would be admissible only if it helped to establish some element of the crime under consideration or was relevant because of some recognized exception to the general rule *(see, People v Alvino,* 71 NY2d 233, 241-243; *People v Lewis, supra,* at 325; *People v Molineux,* 168 NY 264, 293). Even when admissible for such purposes, the evidence may not be received unless its probative value exceeds the potential for prejudice to the defendant *(People v Ely,* 68 NY2d 520, 529; *People v McKinney,* 24 NY2d 180, 184). Here, the probative value of the challenged testimony was clearly outweighed by its prejudicial effect. Defendant was

charged with felony murder for setting an arson fire that resulted in the death of his aunt. The challenged history portion of defendant's hospital record contained prejudicial references to prior arson threats that defendant had made against other members of his family and the obvious effect of such testimony was to show a propensity on defendant's part to commit the crime for which he was on trial *(see, People v Greer,* 42 NY2d 170, 176; *People v Duffy,* 36 NY2d 258, 262, *cert denied* 423 US 861; *People v Anderson,* 80 AD2d 33, 39). Moreover, it is uncontroverted that Dr. Cavanaugh did not rely on this history in making his diagnosis of defendant and thus, the history portion of the record was not admissible under the business records exception to the hearsay rule *(see, People v Harris,* 132 AD2d 940; *People v Jackson,* 124 AD2d 975, *lv denied* 69 NY2d 746). Although the trial court, in its final instructions to the jury, instructed them that they could not consider defendant's history as evidence that defendant actually did or said what was reported in the file, nevertheless, we find that this was not sufficient to overcome the highly prejudicial character of this evidence. Nor can this error be considered harmless.

■ Defendant was also denied a fair trial by the court's erroneous determination that evidence of defendant's mental limitations would be treated as an affirmative defense. Defendant's counsel abandoned his plan to raise an insanity defense under Penal Law § 40.15, but sought to present evidence of defendant's intellectual limitations as it related both to defendant's inability to knowingly and intelligently waive his *Miranda* rights and to the *mens rea* element of the arson charges. It is well established that proof of a mental defect or deficiency short of insanity, although not having acquired the status of a statutory defense, may still negate a finding of specific intent essential to sustain a conviction *(see, People v Segal,* 54 NY2d 58, 66; *People v Morales,* 125 AD2d 605, 608, *lv denied* 70 NY2d 651). Here, the effect of the court's ruling was to raise defendant's "diminished capacity" defense to an affirmative defense on which defendant had the burden of proof *(see,* Penal Law § 25.00 [2]). This ruling was contrary to the well-established axiom that in a criminal prosecution "due process imposes on the prosecution the unalterable burden of proving beyond a reasonable doubt every element of the crime charged" *(People v Kohl,* 72 NY2d 191, 198). Thus, the trial court's determination as to the burden of proof on defendant's "diminished capacity" defense shifted the burden of proof to

defendant and denied him his due process right to present a defense.

For all of the reasons stated herein, defendant was denied a fair trial. Accordingly, the judgment of conviction should be reversed and the defendant granted a new trial.

DILLON, P. J., BALIO, LAWTON and DAVIS, JJ., concur.

Judgment unanimously reversed, on the law, and new trial granted.